[825 NYS2d 187]

Lawrence L. Gaslow, Respondent, v QA Investments LLC, Appellant, et al., Defendants.

First Department, November 16, 2006

## APPEARANCES OF COUNSEL

*Steptoe & Johnson LLP*, Washington, DC (*Charles G. Cole*, of the District of Columbia bar, admitted pro hac vice, *James B. Moorhead* and *Catherine Ševčenko* of counsel), and *Trachtenberg Rodes & Friedberg LLP*, New York City (*David G. Trachtenberg* of counsel), for appellant.

*Venable LLP*, Washington, DC (*Damon W.D. Wright*, of the District of Columbia Bar, admitted pro hac vice, and *Campbell Killefer* of counsel), and *Venable LLP*, New York City (*Brian D. Maddox* and *Gregory W. Gilliam* of counsel), for respondent.

## OPINION OF THE COURT

ANDRIAS, J.

The issue presented is whether the illegality of a complicated tax shelter strategy in which plaintiff invested was "inherently unknowable" to him under Delaware law, thus tolling the commencement of the applicable three-year statute of limitations?

As pertinent to this appeal, plaintiff's cause of action for breach of contract arises from his participation in a tax shelter scheme called the Offshore Portfolio Investment Strategy (OPIS), which was ultimately found to be illegal by the IRS. OPIS involved a series of transactions to enable a taxpayer to generate sufficient capital losses to offset certain capital gains by trading certain securities through an offshore company. In July 1998, plaintiff was introduced to OPIS by defendant KPMG, his long-time tax advisor and accountant. Concerned that OPIS was a risky investment because the IRS might "change the rules," plaintiff requested and received opinion letters from KPMG and defendant Sidley Austin Brown & Wood (Brown & Wood) stating that it was "more likely than not" that the IRS would accept tax deductions based on OPIS.

On September 18, 1998, KPMG entered into an agreement with defendant-appellant QA Investments LLC (QA) to handle the investment aspects of OPIS. KPMG, plaintiff and QA met on September 25, 1998 to finalize the arrangements for plaintiff's participation in OPIS, which resulted in an "Investment Advisory Agreement," dated September 30, 1998, which was to be governed by the laws of the State of Delaware and provided, inter alia, that QA would provide services "in the best interests of the Client in light of such investment objectives,"

would "comply with all material laws, regulations, and rules applicable to its performance of its duties and obligations under this Agreement, including . . . all applicable Tax Laws and regulations," and would "remain responsible for its gross negligence, willful malfeasance, or violation of applicable law."

Under Delaware law, an action based on contract has a three-year statute of limitations (Del Code Ann, tit 10, § 8106). Ordinarily, the action accrues at the time of the wrongful performance of the contract, even if a plaintiff is ignorant of the cause of action (*Wal-Mart Stores, Inc. v AIG Life Ins. Co.*, 860 A2d 312, 319 [Del 2004]; *Isaacson, Stolper & Co. v Artisan's Sav. Bank*, 330 A2d 130, 132 [Del 1974]). However, the limitation period will toll where there has been active concealment or

"[u]nder the 'discovery rule' the statute is tolled where the injury is 'inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.' In such a case, the statute will begin to run only 'upon the discovery of facts "constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of such facts' " (*Wal-Mart Stores, Inc.*, 860 A2d at 319; *see also Layton v Allen*, 246 A2d 794 [Del 1968]).

That is, the "inherently unknowable" exception to the ordinary accrual rule "occurs when there are no observable or objective factors which put laymen on notice of a problem, such as in a title defect or certain medical malpractice actions" (*Began v Dixon*, 547 A2d 620, 623 [Del Super Ct 1988]). However, "[i]nquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct," and it may even require an expert to uncover the alleged wrongdoing (*In re Dean Witter Partnership Litig.*, 1998 WL 442456, *7, *7 n 49, 1998 Del Ch LEXIS 133, *30, *31 n 49, *affd* 725 A2d 441 [Del 1999]). " '[O]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice' " (1998 WL 442456 at *7 n 49, 1998 Del Ch LEXIS 133 at *31 n 49, quoting *Harner v Prudential Sec. Inc.*, 785 F Supp 626, 633 [ED Mich 1992], *affd* 35 F3d 565 [1994]).

The foregoing is significant because, in January 2001, plaintiff met with KPMG to discuss estate planning. No one from QA at-

tended this meeting. Plaintiff's son and plaintiff's personal attorney, Harvey Goldstein, were present, as was Gene Schorr of KPMG. At the end of the meeting, Tim Speiss of KPMG came in and told plaintiff that there might be a problem with OPIS because the IRS was looking at another strategy that shared some similarities with OPIS. Plaintiff's son then said to Schorr, "should we sue you?" Schorr responded that he would not blame them if they did.

Thereafter, Goldstein wrote to KPMG on behalf of plaintiff, seeking confirmation that KPMG still stood behind its written tax opinion of December 31, 1998, which had found that it was more likely than not that OPIS would be acceptable to the IRS. On or about March 23 or 24, 2001, KPMG wrote back, reassuring plaintiff that it continued to stand by its opinion as to OPIS. KPMG acknowledged that concern had been raised by recent IRS Notice 2000-44 (2000-2 CB 255) which concerned another strategy with similarities to OPIS, and noted that the IRS "may attempt to argue that Notice 2000-44 applies" to OPIS, but KPMG assured plaintiff that all issues raised in IRS Notice 2000-44 (2000-2 CB 255) were addressed, and that that notice did not change KPMG's opinion as to the legality of the OPIS deductions.

In July 2001, the IRS issued Notice 2001-45 (2001-2 CB 129) disallowing transactions such as OPIS. Later that summer, plaintiff received an IRS audit notice that ultimately led to a negotiated settlement of plaintiff's resulting tax liabilities. KPMG also entered into a "Deferred Prosecution Agreement" with the government, admitting that from 1996 to 2002, it "develop[ed], promot[ed] and implement[ed] unregistered and fraudulent tax shelters," including OPIS, prepared false tax returns for tax shelter clients, false factual recitations as part of documentation for the tax shelters, and issued opinions containing false and fraudulent statements. KPMG also admitted that, in order to keep OPIS secret from the IRS, it chose not to register it as a tax shelter, as required.

Plaintiff commenced this action on March 19, 2004 and, as pertinent to this appeal, QA moved for summary judgment dismissing plaintiff's cause of action for breach of contract against it as barred by Delaware's three-year statute of limitations on the ground that its work for plaintiff was completed by December 1998 and that it had no further contact with plaintiff regarding OPIS. Plaintiff opposed on the ground that pursuant to Delaware's "time of discovery rule" the statute of limitations was tolled.

The motion court denied the motion on the ground that issues of fact were presented as to whether the wrong was "inherently unknowable and the claimant is blamelessly ignorant of the wrongful acts," and held that the statute of limitations would run only "upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." Essentially, the court found that the OPIS strategy was complex and that plaintiff relied on defendants' professional advice, as late as March 2001, when KPMG reaffirmed its opinion as to OPIS. Thus, the court found that "an objective person, relying on his or her investment advisors, could justifiably rely on their advisors for such information and advice as to the validity and legality of such transactions."

Rather than applying an inquiry notice standard to begin the limitation period at least by January 2001, the court appears to have required actual notice of the wrongful conduct. That is, the court found that the assurances given to plaintiff by KPMG after the January 2001 meeting created contradictory facts "requiring a fact finder to determine when exactly [plaintiff] knew or should have known that the OPIS transaction was illegal." Thus, the court found that issues of fact existed as to when the statute of limitations began to run, which, according to the court, could have been as late as July 26, 2001, when the IRS issued its tax opinion that OPIS was an improper tax shelter. We disagree.

As previously noted, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice" (*In re Dean Witter Partnership Litig.*, 1998 WL 442456 at *7 n 49, 1998 Del Ch LEXIS 133 at *31 n 49). Clearly, plaintiff was on inquiry notice by at least January 2001, when he was told there was a problem with the OPIS transaction, and Schorr said that he would not blame plaintiff if he sued KPMG. Thus, the motion court erred in denying QA's motion to dismiss the breach of contract claim against it.

As noted by QA, plaintiff was a sophisticated investor who was concerned from the beginning that the OPIS investment was too "risky," having previously rejected a similar tax shelter scheme as "garbage" upon the advice of a friend "with extensive business experience." He was also warned that the IRS might change the rules and disallow this type of strategy. Moreover,

the opinion letters he received from KPMG and Brown & Wood both stated that it was "more likely than not" that the IRS would accept OPIS, thus putting an ordinary person on notice that the odds in favor of legality could be as slim as 51% to 49%. Thus, QA argues that plaintiff was on notice of the risks of his investment in OPIS from the very beginning and the statute of limitations ran from the completion of its work for him in December 1998.

However, as stated by the Delaware Court of Chancery: "A failure to detect the existence of a claim will not infrequently be held to toll the running of the statute of limitations where plaintiff reasonably relies upon the competence and good faith of one with special skills or knowledge who accepts a legal responsibility towards plaintiff" (see *Kahn v Seaboard Corp.*, 625 A2d 269, 275 n 5 [Del 1993] [referring especially to professional malpractice claims]). In *Wal-Mart Stores, Inc. (supra* [and cases cited therein]), the Delaware Supreme Court also held that Wal-Mart could not be expected to discover that a certain tax-avoidance strategy advocated by its insurance company might be ruled improper by the IRS. Nevertheless, plaintiff's reliance on *Wal-Mart* is misplaced. There the court held that, even where two technical advisory memoranda issued to other companies expressed the IRS's legal position that the relevant interest deductions should be disallowed and various newspaper articles discussed certain risks related to the strategy, such memoranda and articles did not conclusively establish that Wal-Mart was on inquiry notice inasmuch as there was no evidence in the record that the IRS memoranda were publicly available during the relevant time and the articles simply discussed the tax loopholes and the possibility of prospective legislation to close such loopholes. They did not raise issues of present problems with the strategies, which might render an ordinary person suspicious. Here, on the other hand, plaintiff was expressly told by a member of KPMG that there was a problem with OPIS, and another member, Schorr, whom plaintiff trusted, said he would not blame plaintiff if he sued KPMG, thus putting plaintiff on notice of potential problems with OPIS.

The instant case is more akin to *In re Dean Witter Partnership Litig. (supra)*, in which certain investors sued Dean Witter regarding their investments in certain real estate limited partnerships. The court found that the "critical inquiry" was "were plaintiffs *entitled to rely* on defendants' representations for as long as they did," viz., until publication of an article in

the Wall Street Journal, which plaintiffs claimed first alerted them to their potential claims (1998 WL 442456 at *7, 1998 Del Ch LEXIS 133 at *30). The court held that, despite Dean Witter's misrepresentation regarding the health of their partnership investments, contradictory information contained in the partnerships' annual reports should have been a "red flag" to any investor and should have prompted an inquiry by plaintiffs into the health of their investments (1998 WL 442456 at *8, 1998 Del Ch LEXIS 133 at *37; *see also Pomeranz v Museum Partners, L.P.*, 2005 WL 217039, 2005 Del Ch LEXIS 10 [2005] [partners held to be on notice of withdrawal of general partners when the financial statements reflected the loss of their capital]). Here, plaintiff was expressly told of problems with OPIS, in the presence of his attorney, by the very parties who had convinced him to purchase it in the first place, and was told that they would not blame him if he sued. Surely, at this point plaintiff was on notice of the need for further inquiry.

Plaintiff asserts that he was reassured by KPMG when his attorney wrote KPMG, and was told that it stood by its original opinion letter. The motion court too held that these assurances were "contradictory facts" requiring resolution by the trier of fact. However, it was not necessary that plaintiff know all the facts, or that the problems with OPIS be understood conclusively before the action accrued (*Dean Witter*, 1998 WL 442456 at *7, 1998 Del Ch LEXIS 133 at *30), but only that plaintiff was on notice of the need for further inquiry. As in *Dean Witter*, plaintiff was no longer permitted to simply rely on the very party who convinced him to make the investment, after being told of problems and the legitimacy of a potential suit. *"[Plaintiffs] should not put on blinders to . . . obvious signals . . ."* and could not "sit idly by, blindly relying on defendants' assurances" (1998 WL 442456 at *7, *8, 1998 Del Ch LEXIS 133 at *35, *38; *see also Van de Walle v Salomon Bros., Inc.*, 733 A2d 312, 315 [Del Ch Ct 1998], *affd* 734 A2d 160 [Del 1999] ["glowing forecasts" and "rosy predictions" did not relieve investor of inquiry notice where investor had sufficient facts which he should have found significant]).

Here, there is no allegation that plaintiff did not have access to all the investment information from which to assess the OPIS strategy, even if it required an expert to uncover the wrongdoing, and there is no indication that this could not have been done when plaintiff was first alerted to problems with OPIS. In fact, on the motion for summary judgment, plaintiff submitted

an affidavit of an expert, who assessed the defects in the OPIS investment. Moreover, while plaintiff asserts that he was told that he could not discuss the strategy because it was proprietary and that OPIS was highly complicated, he nevertheless did discuss OPIS with his attorney. Although his attorney was purportedly unfamiliar with the OPIS strategy and simply advised plaintiff that KPMG was a reliable accounting firm, once plaintiff was alerted to problems with the strategy, and at least the potential for a lawsuit, he was then on notice sufficient to require further inquiry and it was incumbent on him to seek out another attorney more familiar with such issues or an independent financial or tax expert to assess the problems.

Plaintiff's argument that, even if he were put on inquiry notice at the January 2001 meeting, there is no evidence that he could have unraveled the fraud in a few weeks, is unpersuasive. Once he was on inquiry notice, the three-year limitation period would begin. He would not necessarily have had to unravel the entire wrongful scheme in a few weeks.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered February 8, 2006, which, insofar as appealed, denied that part of the motion of defendant-appellant QA Investments LLC seeking summary judgment dismissing the third cause of action in the complaint for breach of contract against it, should be reversed, on the law, with costs, and the motion granted to the extent of severing and dismissing the third cause of action in the complaint for breach of contract against QA Investments LLC.

TOM, J.P., FRIEDMAN, MARLOW and GONZALEZ, JJ., concur.

Order, Supreme Court, New York County, entered February 8, 2006, reversed, on the law, with costs, and defendant-appellant's motion for summary judgment granted to the extent of severing and dismissing the third cause of action in the complaint for breach of contract against it.